**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PHARO GAIA FUND, LTD., and PHARO MACRO FUND, LTD. | ) ) ) | |
| Plaintiffs, | ) ) | No. 23 Misc. 360 |
| v. | ) ) | |
| THE BOLIVARIAN REPUBLIC OF VENEZUELA, | ) ) ) | |
| Defendant. | ) | |

---

| | | |
|---|---|---|
| PHARO GAIA FUND, LTD., PHARO MACRO FUND, LTD. and PHARO TRADING FUND, LTD., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 23 Misc. 361 |
| v. | ) ) | |
| THE BOLIVARIAN REPUBLIC OF VENEZUELA, | ) ) ) | |
| Defendant. | ) | |

**OPENING BRIEF IN SUPPORT OF PHARO'S MOTION FOR AN ORDER
AUTHORIZING A WRIT OF ATTACHMENT *FIERI FACIAS***

Stephen B. Brauerman (#4952)
Sarah T. Andrade (#6157)
BAYARD, P.A.
600 N. King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
SBrauerman@bayardlaw.com
sandrade@bayardlaw.com

*Counsel for Plaintiffs*

Dated: August 2, 2023

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ...................................................................................................iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

I.   Pharo's Lawsuits And Judgments ............................................................................ 1

II.  This Court's Prior Alter Ego Rulings ...................................................................... 2

    A.   *Crystallex*: Venezuela's Control of PDVSA as of August 2018 ........................... 2

    B.   *OIEG*: Venezuela's Control of PDVSA through March 2023................................ 3

III.  Venezuela's Continued Control Of PDVSA Following *OIEG*........................................ 4

    A.   The National Assembly's Continued Control of PDVSA Outside of Venezuela.................................................................................................. 4

        1.   The National Assembly's Significant Economic Control........................... 5

        2.   PDVSA's Profits Outside of Venezuela Go to the National Assembly........................................................................................... 8

        3.   The National Assembly Controls PDVSA's Daily Affairs Outside of Venezuela ............................................................................. 9

        4.   The National Assembly Is the Real Beneficiary of PDVSA's Conduct Outside of Venezuela ................................................................ 10

        5.   The National Assembly Continues to Benefit in U.S. Courts While Avoiding Its Obligations.................................................................. 10

    B.   The Maduro Regime's Continued Control of PDVSA in Venezuela.................. 11

        1.   The Maduro Regime's Significant Economic Control ............................ 11

        2.   PDVSA's Profits in Venezuela Go to the Maduro Regime..................... 12

        3.   The Maduro Regime Controls PDVSA's Daily Affairs in Venezuela.................................................................................. 12

        4.   The Maduro Regime Is the Beneficiary of PDVSA's Conduct in Venezuela.................................................................................. 14

       5.     The Maduro Regime Continues to Benefit in U.S. Courts While Avoiding Its Obligations .................................................................... 15

ARGUMENT ...................................................................................................... 15

  I.   The FSIA Permits Attachment Of PDVSA's PDVH Shares ........................... 15

     A.    There Is No Attachment Immunity ...................................................... 15

        1.     Venezuela Holds the PDVH Shares in the U.S. Through Its Alter Ego, PDVSA ................................................................... 15

        2.     The PDVH Shares Are Being Used for a Commercial Activity .............. 17

        3.     Venezuela Has Waived Attachment Immunity ........................................ 17

        4.     A Reasonable Amount of Time Has Passed Since Entry of Pharo's Judgments ................................................................. 18

     B.    There Is No Jurisdictional Immunity .................................................... 18

  II.  Delaware Law Permits Attachment Of PDVSA's PDVH Shares ................... 19

  III. The Court Should Issue A Writ And Name Plaintiffs Additional Judgment Creditors .................................................................................................. 20

CONCLUSION .................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*,
  251 F. Supp. 3d 758 (D. Del. 2017)......................................................................19

*Crystallex Int'l Corp. v. Venezuela*,
  333 F. Supp. 3d 380 (D. Del. 2018)............................................................... *passim*

*Crystallex Int'l Corp. v. Venezuela*,
  932 F.3d 126 (3d Cir. 2019)........................................................................... *passim*

*Crystallex Int'l Corp. v. Venezuela*,
  No. 16-CV-661, 2017 WL 6349219 (D.D.C. June 9, 2017).................................18

*Crystallex Int'l Corp. v. Venezuela*,
  No. 17 Misc. 151, 2021 WL 129803 (D. Del. Jan. 14, 2021)....................16, 19, 20

*United States ex rel. Doe v. Heart Sol.*,
  PC, 923 F.3d 308 (3d Cir. 2019)........................................................................16

*Elliott Assocs., L.P. v. Banco De La Nacion*,
  No. 96-cv-7916-RWS, 2000 WL 1449862 (S.D.N.Y. Sept. 29, 2000) .................18

*Gadsby & Hannah v. Socialist Republic of Romania*,
  698 F. Supp 483 (S.D.N.Y 1988). .......................................................................18

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
  No. 01-cv-0634, 2002 WL 32107929 (S.D. Tex. Jan. 25, 2002)...........................18

*Meadows v. Dominican Republic*,
  817 F.2d 517 (9th Cir. 1987) ............................................................................19

*Ned Chartering & Trading, Inc. v. Rep. of Pakistan*,
  130 F. Supp. 2d 64 (D.D.C. 2001) .....................................................................18

*O'Leary v. Telecom Res. Serv., LLC*,
  2011 WL 379300 (Del. Ch. 2011) ......................................................................20

*OI Eur. Grp. B.V. v. Venezuela*,
  No. 19 Misc. 290, 2023 WL 2609248 (D. Del. Mar. 23, 2023) ..................... *passim*

*OI Eur. Grp. B.V. v. Venezuela*,
  No. 23-1647, 2023 WL 4385930 (3d Cir. July 7, 2023)............................... *passim*

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992) ............................................................................................................17

*Richmark Corp. v. Timber Falling Consultants, Inc.*,
    No. CIV. 88-1203-FR, 1990 WL 84598 (D. Or. May 31, 1990) .........................................18

*Rubin v. Islamic Republic of Iran*,
    138 S. Ct. 816 (2018) ..........................................................................................................16

**Statutes & Rules**

8 *Del. C.* § 169 .........................................................................................................................19

8 *Del. C.* § 324(a) ....................................................................................................................19

10 *Del. C.* § 5031 ....................................................................................................................19

28 U.S.C. §§ 1604, 1610 ..........................................................................................................15

28 U.S.C. § 1605(a)(1) .............................................................................................................18

28 U.S.C. § 1608(e) ...................................................................................................................2

28 U.S.C. § 1610(a), (a)(1), (c) ................................................................................................15

28 U.S.C. § 1610(c) ..................................................................................................................18

28 U.S.C. §1610(c), (2) ............................................................................................................20

Fed. R. Civ. P. 69(a)(1) ............................................................................................................19

iv

Pharo Gaia Fund, Ltd., Pharo Macro Fund, Ltd., and Pharo Trading Fund, Ltd. (together, "Pharo") respectfully submit this brief in support of their Motion for an Order Authorizing a Writ of Attachment *Fieri Facias* against shares of PDV Holding, Inc. ("PDVH") owned by Intervenor Petróleos de Venezuela, S.A. ("PDVSA"), alter ego of Defendant Bolivarian Republic of Venezuela ("Venezuela" or "the Republic," and together with PDVSA, the "Venezuela Parties").[1]

## INTRODUCTION

This Court has held, and the Third Circuit has affirmed, that PDVSA was Venezuela's alter ego through March 23, 2023. Venezuela and PDVSA are estopped from relitigating those findings and have conceded in another case that these decisions preclude them from contesting their current alter ego status. The evidence compels that conclusion in any event: The facts that led to the previous alter ego findings have not changed, and additional facts make clear that PDVSA continues to be Venezuela's alter ego. This Court should authorize the issuance and service of a writ of attachment *fieri facias* against the PDVH shares.

## BACKGROUND

### I.    PHARO'S LAWSUITS AND JUDGMENTS

Pharo is the beneficial owner of certain bonds issued by Venezuela (the "Bonds") under three fiscal agency agreements. *Pharo Gaia Fund, Ltd., et al. v. Venezuela*, No. 20-cv-8497 (S.D.N.Y.) ("8497 Action"), D.I. 62; *Pharo Gaia Fund, Ltd., et al. v. Venezuela*, No. 19-cv-3123 (S.D.N.Y.) ("3123 Action"), D.I. 34. In 2017, Venezuela defaulted on the Bonds. PDVSA

---

[1] Pursuant to Local Rule 69.1, Pharo is submitting a proposed writ of attachment *fieri facias* and a *praecipe* with this motion. (*See* Declaration of Stephen Brauerman in Support of Pharo's Motion for a Writ of Attachment *Fieri Facias*, Exs. 1 & 2.) This action is substantially similar and contains many of the same relevant facts as those at issue in *Contrarian Capital Management, L.L.C., et al. v. Venezuela*, Nos. 21 Misc. 18, 22 Misc. 131 & 22 Misc. 263 (LPS) (D. Del.) (the "Contrarian Action"). Pharo relies on many arguments set forth in the Opening Brief in Support of Contrarian's Renewed Motion for an Order Authorizing a Writ of Attachment *Fieri Facias*, which was filed on July 21, 2023 in the Contrarian Action, D.I. 47.

defaulted on its unsecured foreign debt then, too.  Venezuela and PDVSA remain in default today.

In January 2019, Pharo sued Venezuela in New York state court to recover missed payments on two series of the Bonds.  (*See* 3123 Action, D.I. 1.)  Venezuela later removed to federal court.  (*See id.*, D.I. 1.)  On October 16, 2020, the court entered final judgment against Venezuela, ordering Venezuela to pay over $380 million to Pharo.  (*Id.*, D.I. 62.).  Pharo separately sued Venezuela in federal court to recover missed payments on additional series of the Bonds.  (8497 Action, D.I. 1.)  Despite proper service, Venezuela failed to appear.  On October 25, 2021, the New York Court entered a final default judgment, ordering Venezuela to pay over $1.3 billion to Pharo.  (*Id.*, D.I. 34.)  On May 18, 2023, Pharo served the default judgment on Venezuela, as required under the Foreign Sovereign Immunities Act (FSIA).  (*Id.*, D.I. 35); 28 U.S.C. § 1608(e).

Pharo has registered these judgments with this Court.  (No. 23 Misc. 360, D.I. 1; (No. 23 Misc. 361, D.I. 1; Brauerman Exs. 3, 4.)  Venezuela has not paid any part of the judgments, (Brauerman Decl. ¶ 11), and there is no reason to believe that it will.

## II.    THIS COURT'S PRIOR ALTER EGO RULINGS

This Court already found – in two different rulings, each affirmed by the Third Circuit – that PDVSA was Venezuela's alter ego through March 2023.

### A.    *Crystallex*: Venezuela's Control of PDVSA as of August 2018

In its *Crystallex* decision, this Court correctly held that PDVSA was the alter ego of Venezuela as of August 2018 under the regime of President Nicolás Maduro.  *See Crystallex Int'l Corp. v. Venezuela*, 333 F. Supp. 3d 380, 386 (D. Del. 2018) ("*Crystallex I*").  Considering evidence dating back to 2002, this Court found that Venezuela extensively controlled PDVSA and that PDVSA disregarded its separate legal status.  *Id.* at 406–11; *see also* Brauerman Ex. 100, Ex. 3; Brauerman Ex. 102, Exs. 35, 38, 40; Brauerman Ex. 103, Exs. 54–57, 67–69, 72–74; Brauerman Ex. 104 ¶ 3–5.  PDVSA also acknowledged in its bond offerings that Venezuela had the authority

to "intervene in [PDVSA's] commercial affairs" and impose "material commitments" on PDVSA. *Id.* The Third Circuit affirmed, holding the alter ego test was "easily satisfied." *Crystallex Int'l Corp. v. Venezuela*, 932 F.3d 126, 146 (3d Cir. 2019) ("*Crystallex II*").

### B.    *OIEG*: Venezuela's Control of PDVSA through March 2023

In August 2018, at the time *Crystallex I* was decided, Maduro was both *de jure* and *de facto* President of Venezuela. *See OI Eur. Grp. B.V. v. Venezuela*, No. 19 Misc. 290, 2023 WL 2609248, at *8 (¶ 63) (D. Del. Mar. 23, 2023) ("*OIEG I*"). In January 2019, Venezuela's opposition-led National Assembly rejected Maduro's claim for a second presidential term and named Juan Guaidó interim president of Venezuela.[2] *Id.* (¶¶ 65-67). The United States recognized Guaidó as interim president. *Id.* (¶¶ 68-69). On February 6, 2019, the National Assembly enacted the 2019 Transition Statute, which identified Guaidó as President of Venezuela and authorized him to appoint an *ad hoc* Board of PDVSA to exercise PDVSA's rights as shareholder of PDVH (subject to National Assembly approval). (*See* Brauerman Ex. 7, Art. 34.)

Following *Crystallex I*, additional creditors – including OI European Group B.V., or "OIEG" – moved to attach PDVSA's shares in PDVH to satisfy judgments against Venezuela based on its alter ego relationship with PDVSA. *OIEG I*, at *1. Ruling in favor of the additional creditors, this Court correctly held that PDVSA remained Venezuela's alter ego following recognition of the Guaidó Government, "both in the U.S. and in Venezuela." *Id.* at *2, *21, *24, *27. With respect to the Guaidó Government and the National Assembly, the Court found the 2019 Transition Statute legislated Venezuela's control over PDVSA by empowering Guaidó to appoint an *ad hoc* Board that exercised PDVSA's rights as a shareholder of PDVH; that the

---

[2] This brief refers to the legislative branch associated with the interim government as the "National Assembly," and the legislative branch associated with the Maduro Regime as the "National Constituent Assembly."

National Assembly's power to require preapproval of PDVSA contracts gave it control over the daily affairs of PDVSA; and that the National Assembly, through Guaidó, treated Venezuela and PDVSA's debts as equivalent for purposes of debt renegotiation, had direct access to PDVSA's funds, and considered PDVSA's assets as assets of Venezuela. *Id.* at *22-23; *see also* Brauerman Exs. 90–91, 93–97; Brauerman Ex. 109, Ex. 1 ¶¶ 36, 50; Brauerman Ex. 114, Ex. 2, Exs. A, B, H; Brauerman Ex. 107, Exs. 61–63. With respect to the Maduro Regime, the Court found the Regime exercised extensive control over PDVSA by dictating its oil prices in Venezuela and abroad; that Maduro managed PDVSA's daily affairs by appointing military personnel and government officials as PDVSA's board members and officers; and that the real beneficiary of PDVSA's conduct was Venezuela, as demonstrated by its use of PDVSA's property in furtherance of its policies. *OIEG I*, at *25; *see also* Brauerman Exs. 74–76, 78, 80–82, 84, 86–88. Further, the Court found that, considering either Guaidó or Maduro, allowing PDVSA to adhere to a separate identity would allow Venezuela to "derive[ ] significant benefits from the U.S. judicial system" while avoiding its obligations. *Id.* at *22, *26.

The Third Circuit affirmed. *OI Eur. Grp. B.V. v. Venezuela*, No. 23-1647, 2023 WL 4385930 (3d Cir. July 7, 2023) ("*OIEG II*").

## III. VENEZUELA'S CONTINUED CONTROL OF PDVSA FOLLOWING *OIEG*

### A. The National Assembly's Continued Control of PDVSA Outside of Venezuela

Venezuela and PDVSA have conceded that *OIEG* controls the alter ego issue in other pending creditor actions seeking to attach the PDVH shares, subject to any appellate review. (*Tidewater Investment SRL, et al., v. Venezuela*, C.A. No. 19-mc-00079-LPS (D. Del.) ("Tidewater Action"), D.I. 55; *Valores Mundiales, et al. v. Venezuela*, C.A. No. 23-mc-00298-LPS (D. Del.), D.I. 17). And rightly so, as little has changed.

On January 4, 2023 – more than two months before this Court's decision in *OIEG I* – the

National Assembly enacted the 2023 Transition Statute.  (Brauerman Ex. 10 (the "2023 Transition Statute") at 1.)  It eliminated the position of interim president and removed Guaidó from power. *Id.*  However, the statute did not change PDVSA's relationship with Venezuela – it simply transferred powers previously held by the interim president to the National Assembly.  *See* Brauerman Ex. 5 ¶¶ 27–28.)  The statute preserves the operative language from the 2019 Transition Statute authorizing Venezuela's continued domination of PDVSA.  (*Id.* ¶¶ 23-26.)  And the statute created an Asset Protection Council to better leverage Venezuela's foreign assets – including PDVSA – to reestablish democracy in Venezuela.  (*Id.* ¶ 24.)  The National Assembly has preserved or expanded its powers over PDVSA.  Thus, PDVSA remains Venezuela's alter ego.[3]

1.     *The National Assembly's Significant Economic Control*

In the United States and outside of Venezuela, the National Assembly continues to exercise significant economic control over PDVSA through Venezuela's Constitution, the 2023 Transition Statute, the Asset Protection Council, the PDVSA *ad hoc* Board, and commingling of funds.

a.     *The Constitution and Laws of Venezuela Continue to Enable the National Assembly's Economic Control*

Venezuela's Constitution has not changed since the Third Circuit held that it "endows the State with significant control over PDVSA."  *Crystallex II*, 932 F.3d at 147; *see also OIEG I*, at *22; (Brauerman Ex. 12 at 4; Ex. 13 at 1 (PDVSA discovery responses).)  The Constitution still gives the National Assembly veto power over PDVSA contracts which implicate the "national interest" – a power PDVSA has twice acknowledged includes all contracts with foreign parties. (Brauerman Ex. 15, Arts. 150, 187.9; Ex. 16 at 30 n.84 (PDVSA summary judgment brief); Ex. 17 at 85:21-86:7 (Apr. 30, 2021 *OIEG I* Hr'g Tr.).)  The National Assembly invoked this power

_____

[3] Nor did the 2023 Transition Statute inaugurate a new legal regime – the United States "continues to recognize" the National Assembly as the government of Venezuela.  (Brauerman Ex. 11 at 1 (Jan. 3., 2023 U.S. State Department press statement).)

when it declared PDVSA's bonds void and illegal. *OIEG I*, at *10 (¶ 86).

        b.      *The National Assembly's Oversight of PDVSA's Finances*

The National Assembly exercises economic control directly over PDVSA's operations and assets. For example, PDVSA continues to follow the National Assembly's debt-negotiation strategy and instruction not to pay PDVSA's debts. *OIEG I*, at *13 (¶¶ 108, 112) (citing Brauerman Ex. 19 at 12; Ex. 20 at 3-4). And in May of this year, the National Assembly directed the PDVSA *ad hoc* Board to resolve PDVSA's debt without losing control of CITGO. (Brauerman Ex. 18.) The National Assembly recently began requiring regular "management reports" from PDVSA detailing its activities. (Brauerman Ex. 21.) Earlier this year, it summoned the chair of the PDVSA *ad hoc* Board to appear and justify PDVSA's litigation expenses and decision to pay certain bonds. *Id.* And it announced in February that it will demand the same management reports and testimony from CITGO which it demanded from PDVSA. (Brauerman Exs. 21, 24, 25.)

        c.      *The National Assembly's Authority under the 2023 Transition Statute*

The National Assembly also exercises economic control over PDVSA through the 2023 Transition Statute. That statute does not give PDVSA independence – in fact, *on the same day* the statute was enacted, PDVSA loaned Venezuela over $500,000 with no repayment date. (Brauerman Ex. 9 at 2-3 (PDVSA amended interrogatory responses).) The 2023 Transition Statute maintains the same provisions from the 2019 Transition Statute that enable the National Assembly to dominate PDVSA. (Brauerman Ex. 5 ¶¶ 23, 25.) In service of that goal, the 2023 Transition Statute created the Asset Protection Council, which has "authority" over "all foreign property or assets" of Venezuela and the power to "participat[e] in the management" of those assets, including PDVSA and its subsidiaries, "when it deems convenient." 2023 Transition Statute §§ 9, 13. The National Assembly appoints all five members of the Asset Protection Council, which appoints the

PDVSA *ad hoc* Board (subject to National Assembly approval). *Id.*

Through the 2023 Transition Statute, the National Assembly also continues to "bypass[ ] PDVSA's ordinary corporate governance" by exercising control over PDVSA's subsidiary, PDVH. *OIEG I*, at *11 (¶ 96). Using *the same statutory language* used in the 2019 Transition Statute, the 2023 Transition Statute:

- Overrides Venezuelan law governing PDVSA's authority over PDVH;

- Prohibits PDVH from making any "payment[ ] or equity contribution[ ]" to PDVSA;

- Prohibits the sale, encumbrance, or disposition of PDVSA's assets, including PDVH;

- Subjects PDVH to National Assembly "monitoring and accountability controls"; and

- Prohibits PDVH from having any "relationship whatsoever" with the Maduro Regime.

2023 Transition Statute §§ 13, 14; (*see also* Brauerman Ex. 5 ¶¶ 23, 25.)

"[E]very act" the Asset Protection Council performs must "prioritize" the National Assembly's political goals. 2023 Transition Statute § 2. The Council itself is comprised of Venezuelan opposition figures, and its coordinator, Gustavo Marcano, is one of the original defectors from the Maduro Regime and Guaidó's Minister Counselor of the Venezuelan Embassy in the United States. (*See* Brauerman Exs. 26, 27, 28.) The council is no less politically motivated than Guaidó and has preserved all of Guaidó's appointments to the PDVSA *ad hoc* Board. (*See* Brauerman Ex. 29 (presidential dispatch); Exs. 8, 9 (PDVSA interrogatory responses).) Moreover, the Council operates at the behest of the National Assembly – any change it makes to the membership of PDVSA's *ad hoc* Board, and even its hiring of auditing firms, is subject to National Assembly approval. 2023 Transition Statute §§ 8.7, 13. And to further the National Assembly's goal of keeping PDVSA's assets out of Maduro's hands, the 2023 Transition Statute prohibits the Asset Protection Council from selling, encumbering, or disposing of PDVSA's assets. *Id.* § 14.

7

The PDVSA *ad hoc* Board is an extension of the National Assembly, too.  It has, "since its inception," worked to aid in Venezuela's recovery, and it acknowledges that it "operates at the 'directives'" of the National Assembly, *OIEG I*, at *11 (¶ 98); (Brauerman Ex. 19 at 72 (PDVSA presentation).)  The PDVSA *ad hoc* Board describes PDVSA as "'attached to'" and "controlled by" Venezuela's Ministry of Petroleum and Mining and as "part of the National Public Administration of the Venezuelan Republic."  (Brauerman Ex. 16 at 30 n.84.)  The *ad hoc* Board is still composed of Guaidó appointees, and the chairman of the *ad hoc* Board recently signaled endorsement of a proposal to use *CITGO oil* to pay *Venezuela's debts*.  (Brauerman Exs. 31, 32.)

> **d.**    *The National Assembly's Commingling of Funds with PDVSA*

The National Assembly and PDVSA continue to commingle funds.  The National Assembly pays PDVSA's operational costs, including "personnel expenses" and costs relating to "materials and supplies."  (Brauerman Ex. 33 at 5-7.)  It may use PDVSA funds to pay for its own "ordinary expenses" and "the defense of [Venezuela's] foreign assets."  2023 Transition Statute § 14 ¶ 2.  And PDVSA has paid more than $1 million of Venezuela's litigation expenses in the last eight months through "loans" without a repayment schedule.  (Brauerman Ex. 9 at 2-3 (PDVSA interrogatory responses).)  The PDVSA *ad hoc* Board is also "consider[ing]" a plan to pay Venezuela's debts using its subsidiary's oil.  (Brauerman Ex. 32 (June 2023 interview).)  Further, the Liberation Fund Law, enacted in 2023, authorizes the use of PDVSA's funds to effectuate "the liberation of Venezuela."  (Brauerman Ex. 34 (2023 Liberation Fund Law) §§ 1-3); 2023 Transition Statute §§ 1, 14.  The Liberation Fund Law refers to PDVSA and Venezuela funds alike as "resources of the Bolivarian Republic of Venezuela."  (Brauerman Ex. 34 (2023 Liberation Fund Law) § 2; *see OIEG I*, at *10-11 (¶¶ 87, 90-91).)

> **2.**    *PDVSA's Profits Outside of Venezuela Go to the National Assembly*

Nothing has changed with respect to PDVSA's foreign profits.  They still flow to the

National Assembly.  *OIEG I*, at *11 (¶ 93); *Crystallex II*, 932 F.3d at 148; *OIEG II*, at *10.  The National Assembly continues to refer to PDVSA's assets as "assets held by the Republic," "state owned assets," and "belonging to all Venezuelans," including in the 2023 Transition Statute.  *See* 2023 Transition Statute pmbl. & §§ 2, 5, 8, 9, 13, 14; (Brauerman Ex. 21.)

### 3.  *The National Assembly Controls PDVSA's Daily Affairs Outside of Venezuela*

Venezuela continues to exercise extensive control over PDVSA's daily activities outside of Venezuela.  While the 2023 Transition Statute replaced Guaidó with the Asset Protection Council as the entity with power over PDVSA, it did not alter any of those powers, and in fact used the same language to enshrine them.  (*See supra* at 8-9.)  The National Assembly has exhibited even greater control over the daily affairs of PDVSA and its subsidiaries than before the 2023 Transition Statute took effect by demanding management reports and explanations of PDVSA's business decisions.  (*See supra* at 9.)  And the National Assembly continues to control the PDVSA *ad hoc* Board by controlling its membership, directing when it can make payments on debt, retaining veto power over national interest contracts, prohibiting the disposition of PDVSA's assets, and receiving "loans" from PDVSA.  (*See supra* at 5-8.)

Indeed, the National Assembly's control is so granular that it funds PDVSA's operations, including "personnel" and "materials and supplies."  (Brauerman Ex. 33 at 5.)  It recently instructed PDVSA to organize its debt-litigation strategy in a manner that maintains control of CITGO.  (*See* Brauerman Ex. 18 (May 5, 2023 National Assembly press release).)  And it continues to exercise control over the daily affairs of PDVSA's **subsidiaries**, including CITGO. The prohibition upon PDVH and its subsidiaries from having any relationship with the Maduro Regime is a significant limitation for an oil company, given that Venezuela has the world's largest proven oil reserve.  The prohibition upon equity contributions to PDVSA infringes PDVSA's

shareholder rights, and PDVSA has admitted that it, PDVH, CITGO Holdings, and CITGO Petroleum have not made any dividend payments since at least October 2022. (Brauerman Ex. 8 at 8 (PDVSA interrogatory response).) And as part of its "monitoring and accountability controls," the National Assembly plans to demand management reports from CITGO, PDVH's subsidiary. 2023 Transition Statute § 13; (*see supra* at 6.)

4.    *The National Assembly Is the Real Beneficiary of PDVSA's Conduct Outside of Venezuela*

The National Assembly has used PDVSA as a political tool for years, and it continues to benefit from PDVSA's conduct by requiring PDVSA to prioritize Venezuela's political objectives. (*See* Brauerman Ex. 5 ¶¶ 19–23.) The 2023 Transition Statute requires that PDVSA and its subsidiaries are to be governed with the goal of facilitating "the democratic transition in the Bolivarian Republic of Venezuela." 2023 Transition Statute § 1. The PDVSA *ad hoc* Board's "'main objective'" is to establish democratic government in Venezuela. *OIEG I*, at *12 (¶ 105) (quoting Louis Pacheco, former Chairman of PDVSA *ad hoc* Board). The National Assembly website still provides updates on PDVSA and its subsidiaries, referring to them as assets of the Republic. (*See, e.g.*, Brauerman Ex. 18; *see OIEG I*, at *13 (¶ 113).) And the National Assembly continues to instruct PDVSA to organize its litigation strategy in a manner that benefits Venezuela. (Brauerman Ex. 18 (May 5, 2023 National Assembly press release).)

5.    *The National Assembly Continues to Benefit in U.S. Courts While Avoiding Its Obligations*

For the same reasons this Court explained in *OIEG I*, treating Venezuela and PDVSA separately would entitle Venezuela to the benefit of immunity from attachment of its assets in the United States while allowing it to avoid debts it acknowledges are owed. *OIEG I*, at *14 (¶¶ 120-21). As both this Court and the Third Circuit observed, Venezuela benefits from the U.S. judicial system because certain of its bonds are backed by the stock and assets of U.S.-based

corporations, and thus investors may rely on the assurance that the U.S. legal system will provide a backstop in case of default.  *Id.* (¶ 121) (quoting *Crystallex II*, 932 F.3d at 149).

**B.    The Maduro Regime's Continued Control of PDVSA in Venezuela**

The Maduro Regime continues to exercise the same control over PDVSA that supported this Court's March 23, 2023 decision in *OIEG I*.

### 1.    *The Maduro Regime's Significant Economic Control*

The Maduro Regime's economic control over PDVSA is guaranteed under Venezuelan law and demonstrated by the regime's substantial oversight of PDVSA's business decisions.

### a.    *The Constitution and Laws of Venezuela Continue to Enable the Maduro Regime's Economic Control*

Venezuela's laws guarantee the Maduro Regime economic control over PDVSA within Venezuela.  Articles 12, 302, and 303 of the Venezuelan Constitution ensure the Republic's control over its hydrogen deposits, all petroleum activity, and the shares of PDVSA.  *OIEG I*, at *9 (¶¶ 79-81); (Brauerman Ex. 14.)  And Article 5 of the Organic Hydrocarbons Law requires PDVSA's revenues to be used to finance health and education, macroeconomic stabilization, and investment within Venezuela.  *Crystallex II*, 932 F.3d at 147.

PDVSA has a "constitutionally prescribed role" of "'manag[ing] the Venezuelan oil industry.'" (Brauerman Ex. 16 at 31 (PDVSA brief).)  The Maduro Regime possesses "the power to intervene and mandate PDVSA's economic policies," which enables it to, for example, require PDVSA to make investments unrelated to its oil business, such as in Venezuelan social programs. *Crystallex II*, 932 F.3d at 146-47; *OIEG I*, at *14 (¶ 117); (Brauerman Ex. 38 (PDVSA webpage discussing "social development projects"); Ex. 39 at 3 (PDVSA manages hospital facilities).)

### b.    *The Maduro Regime's Oversight of PDVSA's Business Decisions*

Venezuela continues to "dictat[e] to whom PDVSA must sell oil and at what price."

11

*Crystallex II*, 932 F.3d at 147.  In July 2023, PDVSA increased the domestic price of diesel in the industrial sector but maintained subsidies for the health sector in compliance with a resolution from the Ministry of Petroleum.  (Brauerman Ex. 40 (July 6, 2023 news article).)  Maduro also recently "instruct[ed]" PDVSA's president to work with Vietnam's state-owned oil company, PetroVietnam.  (Brauerman Ex. 41 (Mar. 14, 2023 PDVSA press release).)  The Maduro Regime continues to require PDVSA to supply oil to Venezuela's foreign allies to fulfill Venezuela's prior commitments, even during a severe production crisis, underscoring "how ideological alliances are being given priority over business."  (Brauerman Exs. 42, 43, 44 (news articles describing PDVSA's supply of oil to Cuba, Iran, and China in November 2022 and March 2023); Exs. 45, 46 (Venezuelan oil production plummeting).)  Just last month, Venezuela shipped over 110,000 barrels of oil to Cuba on the *Maria Cristina*.  (Brauerman Ex. 47 (vessel tracking data).)

### 2.     *PDVSA's Profits in Venezuela Go to the Maduro Regime*

As this Court previously found, PDVSA's profits go to Venezuela, its sole shareholder. *OIEG I*, at \*16 (¶ 141); *Crystallex II*, 932 F.3d at 148.  The Maduro Regime routinely refers to PDVSA, its assets, the PDVH shares, and CITGO as Venezuelan property – in December 2022, Maduro tweeted that PDVSA is "of and for the people," and claimed at a press conference that "'we are [CITGO's] original owners; PDVSA owns CITGO and its dividends belong to our country.'"  (Brauerman Exs. 48, 49.)  Maduro's foreign affairs minister stated in May 2023 that CITGO belongs to Venezuela and that a recent OFAC license allowing the National Assembly to negotiate PDVSA's debts is an attempt to "rob" Venezuela of CITGO.  (Brauerman Ex. 50.)

### 3.     *The Maduro Regime Controls PDVSA's Daily Affairs in Venezuela*

Venezuelan officials "maintain a strong presence in [PDVSA's] daily affairs."  *OIEG II*, at \*10.  Within Venezuela, PDVSA's president, directors, vice presidents, and shareholder council are all appointed by presidential decree.  *Crystallex II*, 932 F.3d at 148; (*see* Brauerman Ex. 51

(January 9, 2023 presidential decree appointing PDVSA board of directors).) Maduro routinely appoints government officials, including military leaders, to fill high-level positions in PDVSA. For decades, PDVSA's president has also served as Venezuela's oil minister. *Crystallex II*, 932 F.3d at 148. Pedro Tellechea, an army colonel who has been involved in Venezuela-owned companies for years, has held both roles since March 21, 2023, and prior to Tellechea, Tareck El Aissami, "a long-time lieutenant," served as both External Director of PDVSA and Minister of Petroleum. *OIEG I*, at *16 (¶ 147); (Brauerman Ex. 51 (Jan. 9, 2023 presidential decree); Ex. 52 (Mar. 23, 2023 PDVSA press release); *see also* Brauerman Ex. 5 ¶¶ 16-18.) Also in 2023, Erick Jacinto Perez Rodriguez dual-hatted as Vice Minister of Petroleum and PDVSA's Vice President of Exploration and Production. (*See* Brauerman Ex. 51 (Jan. 9, 2023 presidential decree); Ex. 53 (Dec. 14, 2020 presidential decree); Ex. 54 (Perez LinkedIn profile).) And the Maduro Regime has used a recent corruption crackdown as an opportunity to consolidate its power over PDVSA. Brauerman Exs 5 ¶¶ 17-18; Ex. 55 (Apr. 27, 2023 Reuters article).)

PDVSA is a conduit for Venezuelan domestic energy policy. It is "'attached to'" and "controlled by" Venezuela. (Brauerman Ex. 16 at 30 n.84 (PDVSA brief).) Its website admits that it is "**subordinate to the Venezuelan State**," that the Venezuelan people are "the true owner of the oil," and that the Ministry of Petroleum is "in charge of the national oil policy." (Brauerman Ex. 56 (emphasis added).) In April of this year, PDVSA tweeted that it executes Maduro's "monitoring and management policies" and in June, the Venezuelan Minister of Petroleum issued a press release stating that PDVSA complies with Maduro's "instructions and guidelines." (Brauerman Ex. 57 (PDVSA tweet); Ex. 58 (Ministry of Petroleum press release); *see also* Brauerman Ex. 59 (Apr. 25, 2023 PDVSA press release discussing Maduro's instructions); Ex. 60 (PDVSA press release stating that it is "complying with the guidelines set by President Nicolás

Maduro").)  For PDVSA, failing to meet its goals is tantamount to "fail[ing] Venezuela and . . . Maduro."  (Brauerman Ex. 61 (May 9, 2023 PDVSA press release).)  Maduro, on the other hand, takes credit for PDVSA's oil deals.  For example, in December 2022, Maduro announced a deal between PDVSA and Chevron in PDVSA's Caracas office, referring to the deal as a "'positive step'" for Venezuela.  (Brauerman Ex. 62 (news article).)  PDVSA and Venezuela's physical plant, personnel, and legal strategies are inextricable, too.  PDVSA and the Ministry of Petroleum continue to share physical office space.  (*Crystallex II*, 932 F.3d at 148; *see also, e.g.*, (Brauerman Ex. 63 (Mar. 23, 2023 PDVSA press release).)  Tellechea publicly refers to PDVSA and Venezuela as "'a single work team . . . a single family.'"  *Id.*  And just this year, the National Constituent Assembly authorized Venezuela's Attorney General to exercise "control and supervision" over PDVSA's legal department.  (Brauerman Ex. 64 § 10.)

4.    *The Maduro Regime Is the Beneficiary of PDVSA's Conduct in Venezuela*

PDVSA continues to "exist[ ] to benefit Venezuela."  *OIEG II*, at *10.  PDVSA's website states that one of its strategic objectives is to "'[s]upport the geopolitical positioning of Venezuela internationally.'"  (Brauerman Ex. 56 at 2.)  As this Court observed in *OIEG I*, Maduro uses PDVSA's property, particularly its oil, to support Venezuela's foreign policy, including to satisfy commitments made by Maduro, not PDVSA.  (*See supra* at 11-12.)  Maduro also recently vowed to revive PetroCaribe, which requires PDVSA to supply oil to member states at steep discounts in exchange for political clout and discounts on goods and services.  *Crystallex II*, 932 F.3d at 147; (Brauerman Ex. 65 (Oct. 8, 2022 Bloomberg article); Ex. 66 (June 29, 2022 Maduro tweet).)

The Maduro Regime also spends PDVSA's proceeds on public goods for Venezuelans.  PDVSA's website states that it uses its "[o]il revenues . . . for health, food, investment, roads and various funds" and administers social programs "in coordination with the social plans of Venezuela."  (Brauerman Ex. 38; *see also* Ex. 5 ¶¶ 14, 17.)  On May 2, 2023, Maduro announced

on Twitter that he ordered PDVSA to donate drilling equipment to Venezuela's National Fund for Social Benefits.  (Brauerman Ex. 67.)  PDVSA also manages and administers various state services, like hospitals.  (*See* Brauerman Ex. 39.)  These diversions of PDVSA assets and revenues into "Venezuelan programs that have nothing to do with its business" demonstrate that Venezuela is the real beneficiary of PDVSA's conduct.  *Crystallex I*, 333 F. Supp. 3d at 409; *see Crystallex II*, 932 F.3d at 146-47.

> 5.      *The Maduro Regime Continues to Benefit in U.S. Courts While Avoiding Its Obligations*

For the same reasons set forth above, maintaining separateness between the Maduro Regime and PDVSA would entitle Venezuela to benefit from U.S. courts while avoiding its obligations.  (*See supra* at 10-11); *OIEG I*, at *17-18 (¶¶ 163-64).

## ARGUMENT

**I.      THE FSIA PERMITS ATTACHMENT OF PDVSA'S PDVH SHARES**

To attach the PDVH shares, Pharo must show that the PDVH shares lack "attachment immunity" from execution and that Venezuela lacks "jurisdictional immunity" from suit. *Crystallex I*, 333 F. Supp. 3d at 394-95; 28 U.S.C. §§ 1604, 1610.  Pharo satisfies both tests.

**A.      There Is No Attachment Immunity**

The FSIA permits court-ordered attachment of sovereign property in aid of execution of a judgment where (1) the sovereign holds that property in the United States through an alter ego, (2) the property is being used for a commercial activity, (3) the sovereign has waived its immunity from attachment in aid of execution, and (4) a reasonable period of time has elapsed following the entry of judgment.  28 U.S.C. § 1610(a), (a)(1), (c).  These requirements are met here.

> 1.      *Venezuela Holds the PDVH Shares in the U.S. Through Its Alter Ego, PDVSA*

PDVSA is the 100% owner of the PDVH shares, and those shares are located in Delaware.

PDVSA's shares in PDVH may be attached to satisfy Venezuela's debt to Pharo because PDVSA is Venezuela's alter ego under the *Bancec* factors, as crystalized by the Supreme Court in *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018):

> (1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations. *OIEG II*, at *9.

Following the Third Circuit's decision in *OIEG II*, there is nothing left for the Venezuela Parties to argue on the alter ego issue. They are collaterally and judicially estopped from contesting their alter ego status before March 23, 2023. *See United States ex rel. Doe v. Heart Sol.*, PC, 923 F.3d 308, 316 (3d Cir. 2019); *Crystallex Int'l Corp. v. Venezuela*, No. 17 Misc. 151, 2021 WL 129803, at *11 (D. Del. Jan. 14, 2021). They actually litigated the issue as of March 2023 in *Crystallex* and *OIEG*, resulting in this Court and the Third Circuit actually, necessarily, and finally deciding the issue against Venezuela in two detailed and reasoned decisions. (*See supra* at 2-4). And the Venezuela Parties have conceded in recent briefing and stipulations in other related cases that the *OIEG* decision "foreclose[s]" them from currently contesting the alter ego status. (*E.g.*, Tidewater Action, D.I. 53 at 3, D.I. 55.)

In any event, the facts compel a present-day finding of alter ego. This Court has already assessed most of the facts relevant to Pharo's motion – Venezuela's control of PDVSA in the six years since Venezuela's default on the debt held by Pharo – and correctly determined that they support an alter ego finding. Venezuela's conduct since this Court's prior holdings, such as passage of the 2023 Transition Statute, should receive ***less weight*** because Venezuela is aware that its acts are under scrutiny. *See OIEG II*, at *9. But regardless, Venezuela and PDVSA's recent conduct confirms that PDVSA continues to be Venezuela's alter ego.

First, the National Assembly continues to treat PDVSA as its alter ego.  It exercises economic control over PDVSA outside of Venezuela through the Constitution, the 2023 Transition Statute, the Asset Protection Council, and the PDVSA *ad hoc* Board.  It continues to exercise authority over PDVSA's daily affairs through its oversight of PDVSA's activities, finances, and national interest contracts.  It continues to assert authority over PDVSA's assets and the assets of its subsidiaries.  And it continues to receive PDVSA's profits outside Venezuela, pay for its legal counsel using PDVSA funds, and use PDVSA as a tool to accomplish its political agenda of ousting Maduro.  (*See supra* at 4-11.)

Second, the Maduro Regime also continues to treat PDVSA as its alter ego.  It continues to exercise economic control over PDVSA within Venezuela through the Constitution and oversight of PDVSA's oil pricing and supply decisions.  It continues to exercise authority over PDVSA's daily affairs through appointments of government officials as directors and high-level officers of PDVSA.  And it continues to receive PDVSA's profits within Venezuela, divert PDVSA resources, and use PDVSA as a tool to execute its policies.  (*See supra* at 11-15.)

### 2. *The PDVH Shares Are Being Used for a Commercial Activity*

The phrase "commercial activity" in the FSIA captures the "distinction between state sovereign acts, on the one hand, and state commercial and private acts, on the other." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 613 (1992).  In *OIEG I*, this Court correctly held that the PDVH stock is being used for a commercial activity because "'Venezuela – through PDVSA – uses the shares to appoint directors, approve contracts, and pledge assets as security for PDVSA's debt.'" *OIEG I*, at *18 (quoting *Crystallex I*, 333 F. Supp. 3d at 417-18).  And for the reasons discussed above, PDVSA and Venezuela are collaterally estopped from relitigating that holding.

### 3. *Venezuela Has Waived Attachment Immunity*

Venezuela "irrevocably agree[d] not to claim and irrevocably waive[d]" immunity from

attachment in aid of execution in any "Related Proceeding" in the fiscal agency agreements under which Pharo's bonds were issued.  (*See* Brauerman Ex. 70 § 14(d); Ex. 71 § 14(d); Ex. 72 § 14(d).) The "Related Proceeding[s]" for which Venezuela waived immunity include "any suit, action or proceeding against [Venezuela] or its properties, assets or revenues with respect to this Agreement."  (*Id.* § 14(a).)  That waiver is attributable to PDVSA as Venezuela's alter ego. *Crystallex II*, 932 F. 3d at 139; *Crystallex I*, 333 F. Supp. 3d at 415.

### 4. *A Reasonable Amount of Time Has Passed Since Entry of Pharo's Judgments*

PDVSA and Venezuela cannot deny that "a reasonable period of time has elapsed following the entry of judgment." 28 U.S.C. § 1610(c).  Pharo's Final Judgment was entered in October 2020, and in May 2021 the rendering court held a reasonable amount of time had passed such that Pharo could enforce its judgment.  (*Id.*, D.I. 74; *see* 28 U.S.C. § 1610(c)).  Pharo's Default Judgment has been outstanding for over 21 months and was served on Venezuela more than 2 months ago.  Courts have repeatedly held that shorter intervals are "reasonable" under § 1610(c).[4] Here, Venezuela has had ample time to pay Pharo's judgments but has chosen to default.

### B.    There Is No Jurisdictional Immunity

Under the FSIA, foreign states can waive their immunity from suit.  28 U.S.C. § 1605(a)(1). Here, Venezuela litigated its immunity (and lost) in one suit and refused to appear in another action, resulting in a default judgment being entered against it.  Once a party establishes an

---

[4] *See, e.g.*, *Elliott Assocs., L.P. v. Banco De La Nacion*, No. 96-cv-7916-RWS, 2000 WL 1449862, at *4 (S.D.N.Y. Sept. 29, 2000) (ten days); *Richmark Corp. v. Timber Falling Consultants, Inc.*, No. CIV. 88-1203-FR, 1990 WL 84598, at *2 (D. Or. May 31, 1990) (30 days); *Ned Chartering & Trading, Inc. v. Rep. of Pakistan*, 130 F. Supp. 2d 64, 67 (D.D.C. 2001) (six weeks); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, No. 01-cv-0634, 2002 WL 32107929, at *2 (S.D. Tex. Jan. 25, 2002) (seven weeks); *Crystallex Int'l Corp. v. Venezuela*, No. 16-CV-661, 2017 WL 6349729, at *1 (D.D.C. June 9, 2017) (60 days in part due to Venezuela's "failure to assert that it is attempting to pay the judgment or provide any evidence of such efforts"); *Gadsby & Hannah*, 698 F. Supp. 483, at 486 (S.D.N.Y. 1988) (two months).

exception to sovereign immunity and obtains a merits judgment, it need not establish another exception to register the judgment in another court and enforce it. *Crystallex II*, 932 F.3d at 137.

## II.   DELAWARE LAW PERMITS ATTACHMENT OF PDVSA'S PDVH SHARES

Rule 69 permits enforcement of a money judgment in accordance with "the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(1). Delaware law entitles a judgment creditor to attach a debtor's shares in a Delaware corporation through a writ of attachment *fieri facias*. 8 *Del. C.* § 324(a); *Crystallex II*, 932 F.3d at 134.

PDVSA is the sole owner of the shares of PDVH, a Delaware corporation. *OIEG I*, at *1, *3; *see also Crystallex Int'l Corp. v. Venezuela*, No. 17 Misc. 151 (D. Del.), D.I. 177 (answer by PDVH). By law, those shares are located in Delaware because PDVH is incorporated in Delaware. 8 *Del. C.* § 169; *see Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*, 251 F. Supp. 3d 758, 762 (D. Del. 2017). Accordingly, a judgment creditor may attach the PDVH shares to satisfy its judgments. *See* 10 *Del. C.* § 5031; 8 *Del. C.* § 324(a); *see also OIEG I*, at *29 (Delaware law permits attachment of the PDVH shares).

The Venezuela Parties have argued that the relevant test is Delaware's alter ego test, which they claim requires a showing of fraud or injustice. But this Court and the Third Circuit have already rejected that argument. *OIEG I*, at *29 (citing *Crystallex I*, 333 F. Supp. 3d at 397 and *Crystallex II*, 932 F.3d at 145). Venezuela should not get yet another bite at the apple, and it is collaterally estopped from relitigating the issue again here.

Venezuela is also wrong on the merits on several independent grounds. Federal execution proceedings must follow "the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Fed. R. Civ. P. 69(a)(1). Because the standard for alter ego liability is substantive, not procedural, Delaware's rule does not govern. *See Meadows v. Dominican Republic*, 817 F.2d 517, 524 (9th Cir. 1987) ("[I]dentity for purposes of attribution of

liability among instrumentalities of a foreign state is a matter of substantive law.").  Even if it were procedural, Delaware's rule would be displaced by the *Bancec* doctrine – the FSIA's "federal common-law outgrowth" – which "exists specifically to enable federal courts . . . to disregard the corporate separateness of foreign sovereigns."  *Crystallex II*, 932 F.3d at 139.

Moreover, even assuming Delaware's veil-piercing rule applied, an alter ego showing is a *separate* basis for veil piercing from fraud or injustice. *See also O'Leary v. Telecom Res. Serv., LLC*, 2011 WL 379300, at *7 (Del. Ch. 2011).  And even if fraud or injustice were the applicable Delaware standard, it would be manifestly unjust to allow Venezuela to use its alter ego PDVSA to access U.S. markets and their accompanying legal protections while evading U.S. creditors.

## III.   THE COURT SHOULD ISSUE A WRIT AND NAME PLAINTIFFS ADDITIONAL JUDGMENT CREDITORS

This Court recently ruled that "a creditor wishing to be made an Additional Judgment Creditor under the SPO must obtain at least a conditional writ of attachment by the Step 5 (Writ) Deadline, a date which will be determined by the Court after further consultation."  *Crystallex Int'l Corp. v. Venezuela*, No. 17 Misc. 151 (D. Del.), D.I. 646.  If the Court holds that PDVSA is Venezuela's alter ego, then Pharo has a right to attach PDVSA's assets to satisfy its judgments against Venezuela.  The Court should grant Plaintiffs a writ of attachment by the Step 5 (Writ) Deadline and name Plaintiffs Additional Judgment Creditors so they may serve their writ and participate in the Sale Process.

## CONCLUSION

The Court should (1) find that a reasonable period of time has elapsed pursuant to 28 U.S.C. §1610(c), (2) hold that the PDVH shares are subject to attachment to satisfy Pharo's judgments; (3) authorize the issuance of a writ of attachment by the Step 5 (Writ) Deadline, and (4) name Plaintiffs Additional Judgment Creditors.

20

BAYARD, P.A.

*/s/ Stephen B. Brauerman*
Stephen B. Brauerman (#4952)
Sarah T. Andrade (#6157)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
SBrauerman@bayardlaw.com
sandrade@bayardlaw.com

*Counsel for Plaintiffs*

Dated: August 2, 2023

21